25-2733. Thank you. All right. We are beginning with Mr. Bash, who has reserved two minutes for rebuttal. And, counsel, whenever you're ready, you can get started. Thank you, Judge Merriam. And, Judge Calabresi and the rest of the bench, can you hear me okay? You may be on mute, Judge Calabresi, but it sounds like you can probably hear me. Kyron, can you pause the time? Thank you. Now can you hear me? There we go. I can, Judge. Thank you. All right. Let's try that again. Thank you, Judge Merriam. And may it for the appellants in this case. Now, as this case comes to the court, the question is narrow. It is whether any paragraph of the first amended complaint in this action alleges a commercial activity by Switzerland. Now, under Section 1603D of the FSIA, that can be either a commercial course of conduct or a single commercial transaction or act. This, the way that is judged under the Supreme Court precedent is really one of two standards. One is the state acting as a player within the market as opposed to a regulator of the market. Or, alternatively, is the state engaged in conduct that is customarily carried on by private parties for profit. I think... It sounds like you're suggesting that if any single act falls within the definition of commercial activity, Switzerland loses its immunity? No, Judge Chin, because... In the way you said it, a single commercial... And that's because defining the activity as a single act comes with a cost for plaintiffs who are trying to pierce the immunity of a sovereign. Namely, the plaintiff then has to meet the in connection with requirement with respect to that specific act rather than some broader course of conduct. So let me just give you... You're not relying on the argument that any single act gets you in the door? It can't get you in the door in the sense of waiving immunity because there are more requirements under Section 1605A2. Yeah, but let's come back to that. Suppose some of the things viewed by themselves might be something that other brokers could do, but in the context of the whole thing, they are part of something that only the government can do. Are you telling us that we should separate out those things which maybe an individual could do, or are we supposed to, as I had thought, look at the whole thing and see if taken all together, this is something that only the government can do? Judge Calabresi, with respect, I think you do pick out the individual actions and ask whether they are commercial transactions or acts, but as I said to Judge Chin, that comes with a cost. We then have to show that the thing we're suing about, which in this case is the write-down of the AT-1s, is in connection with that act. So let me just give you what I think is a realistic example. Suppose that a member of the armed forces of a foreign country sues because of some negligent act on the battlefield and says, you know what, my employment is commercial because I have to buy things at the commissary in the course of that employment. I think a court in your position would say your employment as a member of the armed services is not commercial. You can't sue that as the commercial activity or course of conduct. Yes, your purchases at the commissary are commercial, but now you're going to have to tie that to the action on the battlefield that you're suing over. That's going to be pretty hard. So in this case, one act that I think is very clearly commercial, and they don't really have a good argument against this, is the guarantees that Switzerland made to UBS that if this transaction resulted in some specified losses, we will cover those losses. There is nothing sovereign about that. That is classically commercial. The court could reverse on that basis alone. Now, when we go back on remand, then we're going to have to tie that. Would you look at that in the context, the broader context, the overall context, the full range of conduct that occurred here? Well, I don't mind looking at it. Courts do, as this court said in Pablo's story, look at context. But context can't be used to do two different things. One, it can make a bank make a loan, an investment bank and broker a deal, but it seems to me that Switzerland was doing a lot more than that here. It was making huge loans, as the district court found. It wasn't – I mean we don't look at the purpose, but it was doing things that many private players would not do. These were not the type of loans or guarantees that a private player would make. Judge Chin, respectfully, I don't think that's true. These were a garden variety of loans pursuant to private contracts. This was not like the EM case where these are special drawing rights. Don't we have to look at the context? Otherwise, almost anything that a government does could, in some individual instances, apart from the context, be viewed as commercial. And that would destroy the whole thing. Now, I know we don't look at purpose, but if we look at the thing together and on the basis of that look at the individual act, don't we have to say whether the individual act then was something that in that context was something that only a government could be part of? Judge Calabresi, we don't dispute that context is relevant, but as you said, it can't bleed into purpose. And I think the arguments they're making are the same arguments you could make when the government enters into a procurement contract to buy enough ammunition to fund the United States Army or the Chinese military. Are you conceding that at least some of the things that were done by Switzerland in this case could only have been done by the government? The passage of statutes, the requirement that the ANK1s concede go along, you know, several of these things. The waiving of shareholder approvals. That is, that at least some of these things are things which could only have been done by the government. Judge Calabresi, I don't even remotely concede that for the vast majority of these acts. Contract negotiations, setting up data rooms, screening buyers, loans, guarantees that were ordinary commercial guarantees. Do private players make $45 billion loans? Do private players have the ability to change the law instantaneously? Do private players have the ability to threaten a state-run receivership? Judge Chin, I'd like to take each of those three in context because I think the answer is essentially yes for all of those. So let me start with the first. In terms of the size of the guarantees and loans here, I mean, the guarantee here was 9 billion francs, which is like $10 billion roughly. I think we just saw in the news last week SpaceX made a purchase of $60 billion of another company. If you Google loans or debt issuances of private companies, they're frequently in the tens of billions of dollars. And that's all aside from the fact that I think Rush Presbyterian and Weltover itself teach that scale is irrelevant because that would essentially immunize wealthy countries in a way that poor countries are not immunized. So that's one. Two, I think you referenced the waiver of shareholder approval, and Judge Calabresi referenced the ordinances. As Judge Ho correctly recognized, sovereigns only act through statutes, regulations, and ordinances. So I don't think the mere fact that it achieved something in the market through a regulation or an ordinance matters. Now, let me just – I know I'm running short on time, but I hope I can get through this answer with you. Let me give you two ends of the spectrum and say why I think this is closer. So just on the ordinances to the other end of the spectrum. Well, why don't you give us the answer to the third – I think you said there were three things that Judge Chinray – Okay. – that he would refute were – I'm trying to remember now what the third point was. State-run receivership. Right, the threat of resolution. Oh, okay. So there is no allegation in this complaint whatsoever that any threat was made to UBS. So even if you discount everything with respect to Credit Suisse, what the complaint alleges was that Switzerland was bargaining and negotiating with UBS and even increased the guarantees, which, again, are indisputably commercial activities, in order to induce UBS to agree to this deal. That whole pace of negotiations, guarantees, loans, is commercial. But the last point I'll make, I don't think it would matter even if there was coercion. And let me just give you what is an extremely realistic scenario. A U.S. energy company goes into a country without strong rule of law, and that country says if you don't enter into deals for the sale of oil to our state-owned enterprises, we will expropriate your property and kick you out of the country. Clearly sovereign threat. Far more explicit than anything possibly alleged here. I don't think that means that the resulting contracts are unenforceable under the FSIA. Indeed, the whole purpose of the FSIA is when the courts of that state are not amenable to U.S. companies, they can come here. So it would be remarkable if a sovereign threat that induced a commercial contract or activity suddenly rendered all of that activity inherently sovereign. I hear you, the example you are giving. On the other hand, the way you are arguing makes it sound if in the context of doing something, which is only what a state can do, the state does a couple of things which could also have been done by individuals privately. That means that we have to look at those and whether those were involved in doing harm. And if we did that, then the Foreign Sovereign Immunity Act would almost always be out. Judge Calabresi, Judge Mayer might complete the answer to this question. I know I'm over time. Judge Calabresi, I don't think that's true both for a jurisprudential reason and a case-specific reason. So the jurisprudential reason is, as I said before, if we're limited to that one discrete commercial act in what, by supposition, is a broader scope of sovereign conduct, it's like the soldier buying food at the commissary. That's a commercial act, but it's going to be pretty hard to meet the in connection with requirement if we're limited to that discrete act. So it comes at a cost to plaintiffs. It's not going to blow up the FSIA because you're not going to get past 1605 on the in connection. But the other thing I would say, even if you're not buying anything I'm selling on that, this complaint alleges a lot more than, you know, a sea of sovereign activity and then a bunch of stuff that one commercial act. I mean, remember, the FSIA Congress was aware of the 1907 J.P. Morgan crisis. The traditional solution for banking crises were for private investment banks to get involved in negotiating deals, as Switzerland did here, screening buyers, advising. Remember, it alleges here that Switzerland was the go-between between UBS and Switzerland in a commercial transaction negotiation and then gave guarantees and brokered loans from the Swiss National Bank. That is all classic commercial activity. Any of those should warrant reversal. And if the court reversed on narrow grounds like the guarantee, then we'd have our work cut out for us on remand to get to your question about establishing in connection with the AT-1 write-downs. I think we have a good argument, but the other side is going to dispute that. So I don't think it blows up the FSIA. What it does is mean that plaintiffs will have work to do on in connection with if the commercial activity is defined as a discrete act within a broader scope of conduct that is not commercial. Thank you, Counsel. We have reserved some time for rebuttal. We'll hear from you again. We'll now hear from Attorney Reddy. Good morning. May it please the Court. Anita Reddy of Wachtell Lipton for the Swiss Confederation. Switzerland's rescue of Credit Suisse by arranging a merger with UBS was the action of a market regulator, not a private market player. And in making that determination, the district court properly considered the full range of Switzerland's actions to facilitate the merger to decide if they qualified as commercial activity. It's true that the statute provides that a commercial activity may be either a course of conduct or a particular act, but plaintiffs themselves pleaded, expressly pleaded, that Switzerland's alleged commercial activity was a course of conduct. It's so-called brokering of the merger between October 2022 and March 2023. And even if plaintiffs had alleged one particular act in that course of conduct to be commercial activity, the district court would still have been right to examine the full range of Switzerland's actions. That is because the context of a foreign state's action is relevant to determining whether any particular act qualified as commercial activity. That was the insight of Judge Lynch in the Pablo Starr decision. Context is critical because any course of conduct and even any particular act can be subdivided into- Okay, I agree with you completely, but let me ask you, suppose that for a period of time, say some years, what Switzerland was doing was no more than an ordinary private party would do. But then when things got worse, it started doing things that only a government could do. Should we separate out what was done in the first part and see whether that in itself caused harm? Or is the context that develops later sufficient to bring in what happened earlier? I think it will depend on the particular facts, Judge Calabresi, but I do think context is important. And if that prior- it's going to depend on how closely related that prior conduct was with the ultimate sovereign activity and the significance of that sovereign activity. I don't think you can draw a false distinction between the two. So what you're saying is my hypothetical might be there, but doesn't fit this circumstance because really the context was entirely governmental from the beginning. I agree with you, Judge Calabresi. That's not this case, but there are- But I didn't say that was my point of view. I said that's what you were arguing, so I hope you agree with it. I want to be clear. We are not suggesting a mechanical rule in which where a foreign state engages in any trivial or occasional or incidental act that resembles the conduct that's a sovereign act in relation to a long course or a significant course of commercial activity that it would be entitled to immunity. The court has to look at the alleged activity in context and as a whole. And the ultimate inquiry under Weltover is whether the government acted as a regulator or a private player in the marketplace. Does it matter? The amended complaint alleges that Switzerland itself referred to this as a commercial solution and that instead of entering into resolution sort of the takeover receivership approach, they were engaged in a private commercial resolution. Does that matter? I don't think it does, Your Honor. I think it actually goes to Switzerland's conception of its own purpose, its own characterization of its objective, which was to achieve something resembling a private law merger. But I think what's important for the Court to look at, and I think the dictate of the So I don't think it's relevant how Switzerland characterized its ultimate objective. I think what's relevant are the actions that Switzerland took to achieve that objective. So you're saying that notion that purpose is not important, is not what we look at, which usually is used by parties to say that this is commercial, in this case cuts the other way. And you say that purpose doesn't matter because what they did was governmental. Certainly. And certainly if it's being used here to tag Switzerland with commercial activity because Switzerland said or characterized its own purpose in a way that arguably is commercial, I don't think that should control the analysis. The argument is that all of these things that, excuse me, Switzerland did were things that private players do, making big loans like we saw last week apparently. How do you respond to that? Many of these things are things that we see private players do. And we're not supposed to look at the purpose. No, I disagree. Plaintiffs argue that the particular characteristics of the loans and guarantee here are irrelevant. But they are not. I think the lesson of Weltover is you have to look at the particular loans and guarantee that Switzerland made, not just the general truism that private parties make loans and guarantees. So what is there about these loans or these guarantees that make them sovereign in nature? Well, let's just start with our size, which Judge Ho emphasized as well. There are not private market transactions of comparable size that occur within a span of four days on these terms. And I will note that with respect to size, plaintiffs do not argue that there are. They say in their brief a private investment bank could convince public institutions to provide financing that vastly exceeds market alternatives. That only a public institution could provide loans and guarantees on this scale is a telltale sign that they were not comparable to private market activity. But even if you set aside the question of size, as plaintiffs insist the Court must, and look only to the terms of the loans and guarantee, the plaintiffs still identify no analog to private market transactions. This Court's decision in E.M. v. Argentina, cited in our papers, confirms that when a loan is not available in the commercial market, it is not analogous to a private commercial transaction. And plaintiffs acknowledge in their reply brief that private actors do not offer, I am quoting here, similar terms as to what Switzerland offered here because it is not profitable for them to do so. To put plaintiffs' concession in the words of Weltover, the particular loans and guarantee that Switzerland made are not the type of actions by which a private party engages in commerce and so are not commercial activity under the FSIA. I would like to say a word about counsel's reference to Switzerland's dealings with UBS. To separate Switzerland's dealings with UBS with respect to the merger from its dealings with Credit Suisse is to create, is to draw an artificial distinction. By plaintiff's own account, Switzerland was in a position to offer UBS attractive merger terms because it had asserted control over Credit Suisse, proposing merger terms without Credit Suisse's approval or even involvement. In fact, plaintiffs themselves allege that Credit Suisse objected to the terms Switzerland offered on its behalf to UBS as a cold expropriation in favor of UBS. So the notion that Switzerland's dealings with UBS, its merger negotiations with UBS can be separated from its dealings with Credit Suisse is a fiction. Finally, I would like to address the ordinance. Again, plaintiffs make the argument that the amendment of the emergency ordinance should essentially be excised from the consideration of whether Switzerland engaged in commercial activity. The governing authorities, again, do not permit that cherry-picking approach. It can't be squared with Pablo Starr's admonition to consider the context of the foreign state's actions. And I should note here that plaintiffs themselves alleged that the course of conduct that constituted Switzerland's commercial activity was the brokering of the merger. And plaintiffs themselves alleged that that brokering activity included the amendment of the ordinance because the ordinance itself included steps to facilitate the merger. The ordinance eliminated the legal requirement for shareholder approval of the merger to ensure that the merger closed with certainty and with speed. And it also expressly confirms the authority of FINMA to issue the write-down order. It is intimately and integrally connected with Switzerland's actions to facilitate the merger. And it would be, again, an artificial separation to preclude the Court from considering it in determining whether Switzerland's actions here looked at, again, as Judge Ho did in their overall context, constitute commercial activity. So apparently the write-down order has been held to be illegal. What's the status of those proceedings? And does that have any impact on this case? I do not believe it does. In terms of the status of the proceedings, the Federal Administrative Court has issued an interim or partial decision finding the order invalid. That is pending an appeal to the Federal Supreme Court. And the decision itself just made a determination as to validity. It did not prescribe a rule and any consequences. So it is a very interim decision at this point. But to answer your second question, Judge Chin, I do not believe it has any relevance to the issue presented here. Plaintiffs allege that the act upon which this action is based is the write-down order. And the question that Judge Ho answered is whether or not plaintiffs have sufficiently established that there was commercial activity by Switzerland in connection with that act. So the status of that act is not relevant to the question presented here, which is whether plaintiffs' allegations of so-called brokering activity constitute commercial activity under this Court's precedents and those of the Supreme Court. Presumably the basis for the invalidation of the write-down order is not that it was not a sovereign act. Absolutely. The fact that a sovereign might, under its own law, that an action, for example, might be invalid under the administrative law of Switzerland, of course, has nothing to do, as Your Honor rightly notes, with whether or not it's sovereign or commercial activity. One side question. When Judge Ho characterized some of these acts as being essentially governmental, acts which were unbe... To what extent does that entail a factual determination? To what extent is that simply a legal determination on the part of that judge? Well, I think here Judge Ho expressly explained that he was accepting as true all of the factual allegations in the complaint. So in that sense, I think Judge Ho's analysis was a purely legal one. He accepted everything that plaintiff alleged as true and then applied the tests again, as articulated by this Court and the Supreme Court. Thank you. Thank you, counsel. Mr. Bash, we'll hear from you again. Thank you, Judge Merriam. To get to Judge Chinn's questions to my colleague, start with the guarantees. There was nothing inherently sovereign about a guarantee against losses for a transaction that the sovereign wanted the private entity to get into. Everything they're saying about context is really a backdoor purpose. The prototypical example from Weltover is bullets sold to the Army. That's a massive transaction. It would be just as easy to say... There's nothing inherently sovereign if you don't look at the purpose. The purpose, you know, is to save the bank for the good of the country. We don't look at the purpose. Correct. It's just kind of an odd analysis. We don't look at the purpose. We just look at the act. Well, as I said before, what makes that make sense and not blow up sovereign immunity is that if this Court says, well, it's the guarantee and that's it, we don't think anything else counts, I don't think it should, but if it says that, then we have work to do in connection. I mean, we're going to have to tie the write-down of the AT-1s in a substantive or causal sense to the guarantees if that's what the Court holds. Now, I believe... Do we look at... We don't look at the purpose, the overall purpose, which is to help the economy, help the country. Do we look at the purpose of the guarantee? In other words, you... Why would a private player make a guarantee? There's usually because they want to make money in the end. Do we look at that here? You don't because it's black-letter doctrine that the lack of a profit motive doesn't matter. Weltover said that. Let me just give you two examples from case law. In Weltover itself, the purpose of issuing those bonds was to forestall a sovereign credit crisis. You could easily say, well, the context, no private party would issue bonds to stop a sovereign credit crisis. The Supreme Court didn't say that. What my colleague said about the level of generality on Weltover, respectfully, is totally wrong. All Weltover said is these things promise a future stream of income. They're negotiable and tradable like bonds, not like guarantees and loans. And private parties can hold them. It did not get into the particular features, the context of a sovereign debt crisis. None of that mattered. The other example we leave from Judge Merriam, the other example I'll give you, is this Court's decision in Pablo Star by Judge Lynch where there the sovereign was engaged in an advertising campaign for tourism or for Welsh cultural activities. No private party just gratuitously says, I'm going to, you know, with no profit motive at all, going to run an ad campaign for my country. Private parties do that for profit when it makes sense. Judge Calabresi, Jim. The question which is so difficult is that we don't, that purpose doesn't matter, but context is everything. And so the question of whether certain acts in context are part of something which is only governmental or whether they are in fact private ones because purpose doesn't matter is one of the cases, of bad cases, frankly don't make very clear. And we are going to have to decide whether in this particular case what is going on is contextually governmental even as to individual acts or whether those were governmental in purpose but not as individual acts. That's what we have to decide. Judge Calabresi, I appreciate the difficulty of that question in some cases. Let me take a shot at persuading you that it's not difficult in this case. Focus first on the guarantees. This is just a contract where Switzerland says if the result of this private merger is X, we will pay you money. There is no difference materially from saying we're going to buy a billion dollars of bullets because we're funding an army. Yeah, the purpose is to save this thing. You keep coming back to the bullet thing. Frankly, I think the bullet case is very different. Let me give you another... Then let me try another one that maybe you'll think is more analogous. I'm trying not to get too analogous because then the usefulness of the analogy dissipates. But suppose that the government enters into severely below-cost contracts to sell food. So they're buying food. They're selling it at much cheaper. And the obvious purpose is to alleviate hunger. It's not doing it for profit. It's doing it to alleviate hunger. It would be remarkable if the food distribution organizations that entered into those contracts with the government could not sue to enforce those contracts because the context was alleviating hunger, not profit. And you can do this. Hopefully that is a better analogy for you to this situation. But again, the purpose here to save a bank or to help the economy doesn't make a plain vanilla guarantee or loan contract that looks like every other loan contract except maybe in size. And even that's not right. Anything other than a commercial activity. And when we go back on remand, if that's what the court holds, we're going to have to tie that activity in connection with the write-downs. And plaintiffs are going to dispute that. And Judge Ho can resolve that in the first instance. Thank you, counsel. Thank you. Thank you both for your arguments. The matter will be taken under advisement.